He will be participating only by the audio system. Well, I'm sorry not to be there in person. Well, we'll invite you back again. Well, thank you. Good. The first matter is United States v. Humphries. Mr. Schweitzer. Good afternoon, Your Honors. Good afternoon, Judge Leone. My name is Brett Schweitzer. I'm here from the Federal Defender's Office representing Mr. Humphries. At this point, I would like to reserve two minutes for rebuttal. Thank you. Your Honors, there's a reason why the government bears the burden to prove inevitable discovery by non-speculative evidence. And that's because what we have here is an admittedly illegally seized gun that the government attempts to introduce a trial on a theory that it would have been discovered if the police had not violated the law. Here, there's simply a failure of proof on the government's part below. Obviously, given the facts here, they come upon a traffic accident. Regardless of whether or not there was any pursuit, I understand the record's not at all clear as to what happened after the traffic accident. But it is clear they came upon a traffic accident. They associated your client and your client's car with being involved in that accident, and they stopped your client. Isn't it inconceivable that they would not have run a record check  Your Honor, I would submit it's not inconceivable at all. What we have here is the police thought an accident had occurred. Correct, Your Honor. No one's disputing that the police, in fact, had a reasonable suspicion to investigate the accident further. A Terry stop would have been permissible. But what we have here is more than the license check that had to have occurred for the inevitable discovery. What would that Terry stop have looked like? Excuse me? What would the Terry stop have looked like? By definition, this Terry stop would have included, I assume, an investigation into the registration of the car that it stopped. Well, that's just the point, Your Honor. You must assume that. That's not what the appellate court's role is. That's the government's burden to introduce evidence below to make out the factual predicate for the inevitable discovery doctrine. No evidence regarding what the policy is with respect to running someone's license in an accident investigation. But more importantly, and the court may say, well, that is obvious, that's the court's prerogative. I would suggest there needs to be some record evidence. The court has said in many situations that matters of common sense are not subject to judicial gap-filling at the appellate level. Not if it involves filling the gap, but not if it involves speculation. But isn't there a continuum in the probability scale between absolute certainty that something will happen and absolute certainty something won't happen? Let's say it goes from 0 to 100. Whatever that scale is, doesn't there come a point where the probability is so high that it morphs into a certainty? That may be at an abstract level, Your Honor, but the court doesn't need to pick that number. The court doesn't need to nail down how certain it would be that the license check would have been run in an accident investigation. There's absolutely no evidence whatsoever that Mr. Hufford's car would have been impounded under livestock. So even if the court is willing to indulge the assumption that the government's offering on appeal... I thought it was mandatory that under those circumstances... Well, it was mandatory that they had to do a search under the... Not at all, Your Honor, and this is a critical point. What we have is a district court fact finding below that impoundment under livestock in a situation where you have a suspended license is permitted, it's permissible, not required. We have a district court fact finding on that. We have the only live testimony of the suppression hearing from Officer Fletcher was to the same effect. He said when the license comes back suspended, we're permitted to livestock it. No discussion about we're required to, our typical practice is that we always do it, nothing of the sort. So aside from the license check, the impoundment decision under livestock is certainly not susceptible to any sort of common sense supposition on the part of this court. And was there any testimony that he would have done a livestock or he would not have done a livestock or he might have done a livestock? There was not, Your Honor. There was no testimony in that regard. That's the gap that's in this record, and that's the gap that's fatal to the government's position. Let's go back to the first gap. It's your position that unless the government put on testimony that the police officer in this case would have said that it is my policy or it's the policy of the department to run a license check whenever there's a traffic accident, that this is a fatal gap in proof? Is that your position? The government could have put on any number of types of evidence. They could have just asked the officer. Are you saying yes or no? If there's no evidence, yes, Your Honor, that's a fatal gap. Now, again, it goes back to Judge McKee's point. Is the court willing to overlook that based on an assumption that a license check is always undertaken? If the court is willing to make that leap, certainly with the impoundment decision and with the issue of whether there were standardized criteria governing that impoundment decision, no leap can be made there. And in order to rule in the government's favor, the court would have to fill all three of those gaps, and that's a critical point, Your Honor. So even if we set aside the license issue, then we move on to, okay, well, would the car have been impounded? Again, no evidence. Let's say we get past that hurdle somehow. Then we say, okay, is there any standardized criteria? Did the government introduce any evidence below regarding standardized criteria governing that decision by the police officer? Impounded or for the search of both? Excuse me? For the standardized criteria to impound or for the inventory search or both? To impound, Your Honor. We have below the one thing that is in the district court record is a copy of the police livestock memorandum which specifies that if impoundment in fact is if a decision is made to impound, then an inventory search will occur, and it also gives forth some specific criteria about how the search is to be conducted. So we're not arguing here. Is that document 26-4? Excuse me? Is that document 26-4 dated July 1, 2002? Subject livestock program policy. That's page 124 in the record, Your Honor. Okay, that's it. So we're not arguing here that there's a lack of criteria with respect to the scope of the search or whether after the impoundment decision is made whether a search will occur. That's not the issue. The issue is the preliminary question. Would the impoundment have occurred? As I understand it, the Pennsylvania statute 6309.2 says the officer shall immediately immobilize the vehicle. Now, that's the standard criteria. If the police exercise some discretion in not applying the standard criteria, does that expose them to having their evidence thrown out? Shall immobilize is the statutory criteria. That is correct, Your Honor. However, what's important there is the statute provides for immobilization. That's not the same as impoundment. Typically, that immobilization could mean putting a boot on a car. Well, it's obviously not a search. It's not a search. Well, you say that it's not an impoundment. Immobilization is a better date of search. Well, that's a question. I want to ask you another question, which you may think is coming out of something out of the brief. But we're free to affirm on anything in the record. And this record seems to me to show objective facts known to the officers that would have justified the arrest quite apart from the DUI arrest. And that would be on the basis of fleeing a scene of an accident. They see this man backing up the wrong way on a street. They see the bystanders pointing at him. They see the damage on his car. They see the victim standing against the wall. I would think any reasonable officer could conclude this man is running away. And that would be a basis for an arrest. Your Honor, the district court, in fact, refused to make that precise conclusion. We do have a situation here where it's undisputed that Mr. Humphreys was backing his car out of the intersection where the collision apparently happened. But that's where the discrepancy in the testimony of the police officers below comes into play. After that point, one police officer says he disregarded signals. He disregarded our signals to stop. He tried to get away. He was blocked in by another car. He jumped out of the car and started to run, clearly fleeing the scene of the accident, clearly flight. The other police officer says, no, he stopped on signals, and he waited in his car until we ordered him out. We ordered him out, and we patted him down. I understand that, but I don't think you replied to my points that created that basis. The severe damage to his car, the fact that he was backing up the wrong way on the street, the fact that bystanders were pointing at him, that was completely fleeing from the scene. That's correct, Your Honor. Those facts are the fact that people or the bystanders pointed to the defendant as he was backing his car out of the intersection. That's not disputed. I would suggest, Your Honor, that that is not probable cause without any further investigation for arrest for fleeing the scene of an accident. Well, why not? He is fleeing. He is getting away from it. His car is damaged. The people around the scene are pointing to him. Well, Mr. Humphrey's explanation was that he was parking his car. Now, the district court did not make a fact-finding here and specifically looked at this issue and said that there was too much inconsistency to make a judgment. Judge Nenner, we're having trouble hearing you. Could you repeat that, please? Yes, Your Honor. Were you able to follow that? I was not, Your Honor. Because I think... Maybe I should be closer to the microphone. Can you hear me? Yes, that's better. I say the facts objectively known to the officers include severe damage to his car going backwards on a long white street, being pointed out by the person at the scene as the perpetrator. Now, objectively, that's cause for arrest. The district judge did not address it because the government did not address it. But that's not waiving the point. That's correct, Your Honor. It was not addressed and not forwarded by any party. However, I would... I think it's certainly an open question as to whether that would create probable cause under Pennsylvania without any further facts to find, to arrest for fleeing the accident. And we should recall here, it's a bit instructive, I think, the district court's probable cause finding with respect to the DUI. At first glance, glassy eyes, smell of alcohol, and rapid speech, which is the undisputed evidence here, would likely lead one to believe that there would be probable cause for a DUI arrest. However, that's clearly not the case under Pennsylvania law, as the district court found. So, I would suggest that the probable cause analysis as to the fleeing the scene is not entirely clear at all. Well, Mr. Swine, as I understand it, the problem with the alcohol was that police officers were not consistent. So, that was the reason to hesitate. But there's no doubt about the facts I just provided to you. There was an inconsistency with respect to the alcohol. In terms of the level of, one officer said it was strong, one officer said it was sort of not strong. The other police report characterized it slightly differently. So, granted, Your Honor, there was some discrepancy there, but it was clear on the record that there was a smell of alcohol. Everyone agreed at that basic fact. Good. Your Honor, as I see my time is up. Judge Nederen, any further questions? No, that's it. Good. Mr. Schweitzer, thanks very much. We'll have you back on rebuttal. Ms. Fields? Good afternoon. Good afternoon. My name is Susan Fields, and I represent the government. Your Honor, when the defense counsel made that specific argument to the trial judge after the suppression hearing, that had they not arrested him for DUI, there would have been no NCIC check, the district court replied on page 92 of the transcript. The court said, yes, but a check for a motor vehicle license is standard operating procedure, essentially when they're investigating an accident, and then further says on page 93, well, even if they had, they would have done, I mean, it is certainly reasonable for a police officer who is investigating an accident, forget about the DUI, an accident, to determine whether or not the driver has a license, so that's certainly reasonable. So we believe that the district court did hear that argument from defense counsel and believed, based on the record they heard, that it was certainly reasonable that a police officer for a traffic accident would run a driver's license check. The defendant's position is that's not sufficient, that the officer should have testified, this is what our policy was or this is what I did. The reason why I asked for the license check was because I was investigating an accident and that there is a fatal gap in the proof here, and what's your response to that? Clearly that question was not asked on the record, Your Honor. It's one of those questions that may be so obvious that it was not asked, and it doesn't mean it's fatal, though, when something is so certain to what had happened. And the only thing I could come up with when I was talking to my fellow trial attorneys about it was we don't ask people how they put on their socks because you can't put both on at the same time, but their socks get on, and this is when a police officer stops a car in the continuum that Judge McKee talked about. It's almost certain they're going to ask for a driver's license. They need to know who they're speaking with. They originally started this with investigating a traffic accident, giving all the factors that Judge Moonen spoke of when they arrived, and that's what's in their mind. It moves quickly on to the DUI offense, but the record does not say they ran the license just because of the DUI or just because of the gun either. That's not stated as to a reason why they ran the record check that I could find in this record. So a record check was run based on all the information in the police officer's mind. Including the DUI. Including what they had thought at that time was the DUI. I don't think that can be ignored either. So the problem I have with this, and the district court never addressed it, no one's really arguing it, but I'm not sure that, let's assume that you're right, that a record check would have been run. I'm not certain that fixes the gaps in it. The policy that's at issue here, 6309.2, as Judge Moonen mentioned in his question, doesn't refer to impounding, it refers to immobilization. It talks about when a car will be booted, basically. And then if we go to the Philadelphia Police Department memorandum that I asked about, the livestock memorandum, there's a note at the top of page 3, after illegal requirements, that says, no, if an authorized tow truck does not arrive within 30 minutes, the officer will issue the citations, terminate the stop, and advise police radio that he or she is back in service. Now, as I read that, it means the police officer phones, when you go to tow a truck, you phone for a tow truck, you wait 30 minutes, if it doesn't arrive, you issue the citations and you leave. You may or may not boot the car, but you have authority to boot the car. It doesn't say anything about what happens to impounding the car if the tow truck doesn't get there in 30 minutes. Now, if you're asking us to assume all these other things on the continuum of probability, it's pretty probable, I think, that if you ask for a tow truck to come, it won't get there in 30 minutes. And having been General Counsel to the Department of the Philadelphia, that's really high up there on the scale of probability. The tow truck won't get there in 30 minutes. And if it doesn't, then we'll agree to that speculation as to what happens to the car. It looks like it's just booted, because you can easily tell a boot truck where the car is, you give them the license number, the officer leaves, the boot truck goes out, sees the car, boots it, and that's the end of it. And the defendant has a citation. That seems to me to be the most logical thing, consistent with the livestock memorandum and the state statute which it tries to implement. And if that is the most logical thing, I don't know how you get to an inventory search, because you don't inventory a booted car. Well, I believe the statute goes to not only immobilization, but towing and storage of the vehicle. I can't speak for how quickly the tow trucks arrive in Philadelphia. Because they have this policy, and this policy is based on 6309, the policy enforces 6309, where they're talking about towing it, and before towing it, that seems to be the number one priority. Point us directly to where either the statute or the livestock memorandum that talks about searching the vehicle. Yes, on page 3 of the livestock memorandum, once a tow truck arrives on location, investigate Officer Schell, and then it goes through, and number 2 is by conducting a vehicle inventory and go through missing or damaged current personal property, a value left in the vehicle by the operator. So page 3. What if there's no tow truck? This policy seems to instruct the officer to tow the vehicle, because in page 2, section 3, impoundment procedures, it says prepare a tow vehicle notice number 6. Let's assume the officer is no bigger than I am, and he or she can't tow the vehicle. The officer has to call a tow truck to do that. Then isn't there a problem? We interpret this as a livestock impoundment, towing, not booting, because that leaves a car on the streets of Philadelphia, and we don't believe that's what this policy was trying to address. It was removing the cars that are not registered or being driven by people that don't have proper license as enumerated in section 2 of the policy. Okay, but you're asking us to rely upon your interpretation of the memorandum and ignore what the memorandum says, because the memorandum says you wait 30 minutes. It doesn't there say then you boot it. It just says you terminate and stop. You issue the citations, you get on your radio, you tell the dispatcher you're back in service. That's what the memorandum that you're interpreting, that you're asking us to rely upon, says. And the policy, the first paragraph of that memorandum, states that the purpose of the policy is to enforce the impoundment provisions of the Pennsylvania Vehicle Code 6309.2. 6309.2 then talks about when the officer shall immobilize. And it's mandatory. That's not permissive. Section A, if a person operates a motor vehicle on a highway while the operating privilege is suspended, the law enforcement officer shall immobilize, not shall impound, shall immobilize the vehicle. Now, it's possible the city of Philadelphia took it upon itself to give its officers more authority than the legislature gave the city of the first class to give it. But that's a problem. And all this stems from the fact that the officer simply never said that what I would do in my course of, in my training, is that once I would have, when I stopped him, when I would have radioed, when I found out that he had no operating privilege, I would have ordered the car towed, and then you may or may not get into questions about what happens if the tow truck doesn't come. But at least then there is a record to act on. But if the record consists of a policy that talks about boarding a car and also a statement that if the tow truck doesn't get there in 30 minutes, you basically leave the car there, there's no way to interpret that, how do you get to inevitable discovery? Well, I think this policy specifically says impoundment because that's the impoundment provision that the policy chose to enforce. Again, the statute says 75-6309 says immobilization, towing, and storage. But the policy from the Philadelphia Police Department setting forth enforcement of 75-6309 specifically said impoundment. That's what they wanted their officers to do as stated, impoundment. What happens if the tow truck doesn't get there in 30 minutes? Then it gives direction about what to do in those situations. And what is that direction? That direction is terminate the stop and issue citations, as Your Honor pointed out on the top of page 3 in the note. And get you back in the car and go back on patrol. How do you get an inventory search out of that? In that case, I believe the way I read it is that the officers do not search the vehicle until the tow truck comes. And so in that case, there would be no inventory search because no tow truck would have arrived. Because you complete the towing report. But that's inconsistent with the next paragraph. The next paragraph that talks about the inventory search says once a tow truck arrives, the investigating officer shall, with the aid of backup, do these things. But the paragraph above that says if the tow truck's not there in 30 minutes, officer, you're not there anymore, you're back in service. So that subsection B has got to be talking about the procedure within the first 30 minutes if the tow truck gets there on time. If the tow truck doesn't get there on time, it seems to me the only logical way to read this is to fall back on 6309.2, the power to immobilize, because you can always order a boot truck to go out there. You boot the car. Officer's back in service. The car is booted. And that's the end of it. And then the person has 24 hours to show up with the proper paperwork. This leads to another part of the policy, and that's could the boot be removed. Yes, Your Honor, and the first provision, though, is for impoundment, and that's what their policy directs. The first provision for is impoundment. In the event that a tow truck doesn't arrive, there are specific instructions of what to do. And sometimes that happens in life when Plan A doesn't work. There's a Plan B. All right, well, Mr. Osweitzer's argument is his record doesn't allow us to conclude that this would have proceeded under Plan A. It's just as likely that it would have been, I don't know, it's just as likely. But we have to speculate to get to Plan A when Plan B, it appears, may well have been what would have occurred. Given the natural flow of events. Absent the officer saying, I would have ordered the tow truck if the tow truck didn't arrive within 30 minutes. I don't know what the policy says, but I would have had the tow truck go out there anyhow, tow it, and it would have been inventory. That's not what the policy allows for, but conceivably an officer could testify that way, and you would get inevitable discovery. It would be a separate issue, I guess, about the reality of that search, but I'm not sure that's a very strong argument. But that's not even where we are. We're stuck with the possibility that under this policy, the tow truck may not get there in time for an inventory search to happen. The officer might be back in his or her car, because the car may get immobilized, and then at least I'm searching for something which will show me on this record that in that event, which may well occur, there would still have been an inventory search. I don't believe that we can get down the continuum to what if Plan A doesn't work when Plan A is prescribed for. I mean, this is what... Isn't that what inevitable means? Inevitable means that on this record, there's no Plan B. Inevitable means we only have Plan A. That's all we have, because that plan, these circumstances, make that plan inevitable. That's what inevitable means. And that would have been a license check would have been done, and based on the individual who had a suspended license, this policy, the livestock policy, would have been instituted. Okay, walk me through how it would have been instituted. What happens? And the first step is that they call... It's impounded. They declare it impounded, and they proceed according to the directions in this policy. Okay, but what is that direction in the policy? How do they proceed? Officer gets on the radio, says, I need a tow truck. Gives the address of the tow truck, and he or she then waits for the tow truck. Prepare any citations. Prepare the tow vehicle notice. Again, all indications that this car will be towed. Number six, prepare the tow vehicle notice. Provide the necessary information. All that is under Section B once a tow truck arrives on location. No, it's under A. Prepare the tow vehicle notice. Any vehicle may be impounded, but it is determined during the... Okay, well, I'm looking at that under B. It doesn't matter whether it's under A or B. I want you to kind of walk me through what happens. He or she gets on the radio. Radio is for a tow truck. And then there may be some citations being written out in the meantime. And then he's beginning to prepare the tow vehicle notice. So that is the instructions and goal for the police officer. Okay. My red light went on, sir. No, you're on our time. And let's assume it's now an hour later. Tow truck hasn't arrived. It's like waiting for AAA to get there when your car won't start. Not a good day. Tow truck hasn't gotten there yet. What happens? But the police officer has done everything instructed of him in this very specific policy. That's my problem, because one of the things instructing of him or her in this policy is you wait 30 minutes, and then you're out of there. You don't impound it. You terminate the stop. To me, terminate the stop means you stop the stop. You terminate the stop. Once you terminate the stop, what happens to the impoundment that you have to get us to conclude is going to happen in order to get to the inevitable discovery? You issue the citation, you terminate the stop, and you advise the radio that you're back in service. That's what the policy says. That is correct. But why should we go to what won't happen when we can assume this will happen? Because this is a policy. It will get towed, because in every case, a tow truck never comes. How many minutes does it take? We have to do that because I'm really hung up on this word inevitable. There's these nine folks down in D.C. They wear robes that look like this robe, and they put this language out there that we have to kind of follow. That's why I got a thing for language. The Supreme Court says that one of the exceptions that will allow evidence which is otherwise improperly seized into evidence is if it would have otherwise been inevitably discovered. So don't blame me. I'm only the messenger bringing them. But that's why I feel like I've got to get hung up on what if the tow truck doesn't get there in 30 minutes. Is it still inevitable that the car would be impounded, there would be an inventory search, when the policy that I'm looking at, the city's livestock program that this whole thing rests upon, seems to be telling me that after 30 minutes, all bets are off as far as the inventory search is concerned. You may get one because conceivably you could still tow the car, but you may not get one. The government believes that the policy is in effect with the 30-minute time frame because it works in 30 minutes. And if it doesn't happen, no, I'm not sure. I knew the answer to that question. I don't know you, babe. I admire your optimism. Let me switch gears a little bit. I gather from what you said that you believe that a plain view search would have been applicable here because there was reason to stop the car, both by reason of the accident and also by the… Well, first, stop the car by reason of the accident. Secondly, there was probable cause because of the suspected DUI. Now, is it your position that a plain view search was appropriate under those circumstances? And if so, how do you deal with the district court's contrary finding? I believe the district court did find undisputed that the officers had reasonable suspicion to stop. However, the district court did say that a DUI would not give an officer reasonable suspicion to look in the car. So I don't believe the plain view was… the judge ruled properly on the plain view determination. Do you know where the gun was? My concern with the plain view is I'm not sure. I've never seen a case like this where I've seen conflict between police testimony before, but never this dramatic. It's amazing. It was very conflicted, and I believe the judge did not make a credibility ruling either way because it was so conflicted. One had it, I think, under the front seat. One had it on the back seat. I was just very conflicted as far as what I read in the record of the… You didn't try the case? I did not, sir. Okay. John, any questions? No, I'm fine. Okay. Thanks so much. Good. Thank you very much, Ms. Fields. Thank you. Mr. Schweitzer. Your Honors, the quite incredible transcript below is precisely why we should be very guarded in letting this evidence in. We have every reason to suspect that the livestock impoundment here was in furtherance of investigative purpose. Now, we don't know. The record isn't fully developed on that as well, but there's certainly very, very troubling discrepancies as to basic facts with respect to where the gun was found and whether the defendant fleed. Now, Judge McKee, you were quite right. Was there any dispute that a gun was found? No, Your Honor. Judge McKee, I believe you were right that there are any number of contingencies that could happen during the livestock procedure that would also erect a bar to the inevitability of the discovery of the gun. And I think that is quite right, and another gap essentially that the government could have but didn't fill at the suppression hearing. But even taking the step before that, the issue, and I won't belabor the point, but the issue as to whether to livestock or not, all of the evidence before the district court is that that is permissive. The statute implies that it's permissive because it only requires immobilization, not impoundment. The memo that was provided to the district court says it was permissive, says they may impound, the police may impound. Officer Fletcher said it may impound. So that's the record we have here. And even if the court were to sort of make the leap that the impoundment would have occurred, there's still another problem, and that is that indisputably there are no standardized criteria governing that decision. The memo says that the impoundment policy will be enforced in a reasonable and equitable manner. That is unbridled discretion, Your Honors. So even if we are to revoke those previous assumptions, the government loses on that point. In sum, Your Honor, I would just say that from all appearances here, the government was essentially not aware of its need to produce this evidence at the suppression hearing. In fact, the government didn't even introduce the livestock memorandum until after the hearing in a post-hearing submission. So I would ask Your Honors not to take that gap-filling function here because it's unwarranted, and we really don't know what those facts would have been. What happened in a case like this? Has the district attorney's office turned this over to the federal prosecutor?